J-A05042-20

2020 PA Super 61

| | | |
|---|---|---|
| IN THE INTEREST OF: M.Y.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Y.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1467 WDA 2019 |

Appeal from the Order Entered August 29, 2019
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000041-2019

BEFORE:  BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    FILED MARCH 13, 2020

Y.L.C. (Mother) appeals from the Court of Common Pleas of Jefferson County (trial court) order entered on August 29, 2019, adjudicating her minor child, M.Y.C. (Child) dependent.[1, 2] After careful review, we affirm.

I.

We glean the following facts from the certified record.  In July 2019, Jefferson County Children and Youth Services (CYS) received a ChildLine

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's Father resides out of state and has little contact with Child.  While he was present for the dependency proceedings below, he did not file an appeal from the adjudication.

[2] Following oral argument, Mother filed an Application to File Supplemental Brief.  See Application for Relief, 12/7/2019.  As we have determined that no additional briefing is necessary, the Application is denied.

report that Mother was allowing a registered sex offender to reside in her home and spend time unsupervised with Child. Upon further investigation, CYS confirmed that Mother's paramour was listed on the registry and that he appeared to be living with Mother rather than at his listed address. When CYS attempted to speak with Mother about this issue at her home, Mother was hostile and denied that he was guilty of the sexual offense that resulted in his registration. Notes of Testimony, 7/29/19, at 3. Mother provided CYS with a court order from the Clearfield County Court of Common Pleas dated August 9, 2018, ordering that he be removed from the registry. CYS then contacted the Pennsylvania State Police (PSP) and verified that Mother's paramour was still on the sexual offender registry because of convictions in two counties, but his status was under review.[3]

Accordingly, on July 25, 2019, CYS filed an application for emergency protective custody of Child on the basis that Mother was allowing Child to be left unsupervised with a registered sex offender.[4] The trial court granted the

---

[3] Mother's paramour was required to register as a sex offender because of a 1999 conviction for Incest, 18 Pa.C.S. §4302, and a 1997 conviction for Indecent Assault—Person Less than 16 Years of Age, 18 Pa.C.S. § 3126(a)(8). The order directing that he be removed from the registry was issued in the former case.

[4] At the time the first ChildLine report was filed, Child was staying in North Carolina with her two aunts, whom she visited every summer. CYS contacted the appropriate child protective agency in North Carolina to perform a home visit and verify Child's well-being. The shelter care hearing occurred when Child returned to Pennsylvania.

application and placed Child with a local aunt and uncle. At the shelter care hearing, Child's guardian ad litem (GAL) represented to the trial court that Child was afraid to return to Mother's care and that she would prefer to stay with her aunts in North Carolina or her aunt and uncle in Pennsylvania. The GAL then stated that on behalf of Child, she would "waive" the requirement that the dependency adjudication hearing take place within 10 days. Id. at 7-8. The trial court scheduled the dependency hearing for August 28, 2019, or 30 days later.

On July 31, 2019, CYS filed the first dependency petition and alleged that Child was without proper parental care or control pursuant to the Juvenile Act, 42 Pa.C.S. § 6302(1), because Mother had allowed a registered sex offender to reside in the home and spend time unsupervised with Child. The petition further highlighted that Mother had denied those allegations and reacted with hostility when approached by CYS and the PSP, such that CYS believed Mother would not protect Child from her paramour. In response, Mother filed an Omnibus Motion for Relief Pre-Adjudication arguing, inter alia, that Child should be immediately released from placement because the adjudication hearing had been improperly delayed beyond the 10 days mandated by the Juvenile Act. The trial court denied that motion.[5]

_____

[5] Mother also moved for immediate production of the dependency petition and to reschedule the adjudication hearing to a different time. The trial court granted those motions.

On August 19, 2019, CYS filed a second dependency petition, this time alleging that Child was without proper parental care or control under the Juvenile Act and that she had been a victim of child abuse as defined in the Child Protective Services Law (CPSL), 23 Pa.C.S. § 6303. In this petition, CYS stated that after filing the first petition it received confirmation that Mother's paramour had been removed from the registry. Nevertheless, CYS had received a second ChildLine report on August 8, 2019, alleging that Mother engaged in physical and emotional abuse of Child since approximately October 2018. After the second ChildLine report was filed, Child confirmed incidents of abuse in a forensic interview and stated that she was terrified of being returned to Mother's care. CYS alleged that these alternative allegations were sufficient to support dependency independent of the first petition.

On August 23, 2019, Mother filed a Motion to Dismiss Dependency Petitions arguing that CYS had improperly filed its second petition as an amendment to the first without seeking leave of court pursuant to Pa.R.J.C.P. 1334. She further argued that the factual bases set forth in the second petition undermine those set forth in the first, and that CYS had removed Child from Mother's care based on legally insufficient grounds.[6] Because the first

_____

[6] Mother acknowledged that the rule governing amendment of dependency petitions allows such amendment "[a]bsent prejudice to any party," but did not argue in her motion that she had suffered any specific prejudice because of the filing of the second petition. Pa.R.J.C.P. 1334(A)(2).

- 4 -

petition was not factually sound and the second petition was filed without leave of court, she argued that both petitions should be dismissed.

At the onset of the dependency hearing on August 28, 2019, CYS made an oral motion to amend the first petition with the second petition, and the trial court granted it. Notes of Testimony, 8/28/19, at 5. Accordingly, the trial court denied Mother's motion to dismiss. Id.

Sara Gow (Gow), a supervisor at CYS, was CYS's sole witness at the dependency hearing. She testified to the allegations that led to the filing of both dependency petitions. She admitted that there was ultimately no factual basis for the first dependency petition, as CYS learned that Mother's paramour had been removed from the registry after CYS filed the petition.[7] However, she maintained that the second ChildLine report, received after the first dependency petition had been filed, supported dependency and Child's continued placement in kinship care.

Gow also testified regarding the Child's disclosures in her forensic interview.[8] She stated that Child recounted multiple instances of physical abuse that resulted in bruises and a scar on her arm caused by Mother's

_____

[7] Gow testified that based on an email from the district attorney, Mother's paramour was removed from the registry on August 14, 2019. Notes of Testimony, 8/28/19, at 17.

[8] Gow brought a recording of the forensic interview to the dependency hearing, but no party requested it be entered into the record and the trial court did not view it before making its determination.

fingernail. Child stated that she was afraid of Mother and would hide from her outside or under her bed. She also stated that they would frequently argue and have "stupid fights such as taking out the trash, various things of that nature." Id. at 13. Child alleged that Mother had commented that she wished she was dead because of Child. These instances occurred over the past five years, but most recently from October 2018 and onward. Gow acknowledged that CYS did not receive any reports of abuse prior to the ChildLine report in July 2019.

CYS also had Child attend a bonding assessment with Dr. Allen Ryen to determine the extent of her bond with Mother and any appropriate next steps to reunite the family.[9] Dr. Ryen determined that Child was afraid of and angry with Mother, and Child indicated that she did not want to have any further contact with Mother. However, he did not diagnosis Child with any mental disorder arising from the alleged abuse. He recommended that Child continue to reside in her kinship placement and not have unsupervised contact with Mother. CYS also scheduled an emotional abuse assessment for Child, but it had not been conducted by the time of the dependency hearing. Gow testified that such an assessment is necessary to determine whether the parent's

_____

[9] Mother was also asked to attend the bonding assessment, but declined to do so on advice of counsel. Dr. Ryen's report regarding his assessment of Child was entered into the record by stipulation of the parties. Notes of Testimony, 8/28/19, at 70.

actions "rose to the level of emotional abuse" and caused a "serious mental injury" under the law. Id. at 23.

Gow testified that throughout the dependency proceedings, Mother was uncooperative with CYS. When confronted with the initial ChildLine report, Mother was evasive, non-responsive, spoke in negative and mocking tones, and initially refused to allow CYS to visit the home. Id. at 32-34. When CYS did visit the home, accompanied by the PSP, she refused to discuss the matter with them but was otherwise calm. After Child was placed in shelter care, Mother would decline to take calls from CYS. Based on the full history of the case, Gow requested that Child be adjudicated dependent based on lack of proper parental care and control and the allegations of abuse. Id. at 38-39.

Mother presented two witnesses, Carole Ishman (Ishman) and Kathryn Trinka (Trinka), to refute the allegations of abuse outline in the second petition. Ishman is Mother's aunt and lived nearby Mother and Child and saw both of them at least twice a week. Ishman testified that she often spent time alone with Child at her home and never observed any signs of physical abuse, emotional abuse or neglect. Child never reported any incidents of abuse to her, but stated that Child did not like it when Mother drank alcohol or chewed tobacco. Id. at 91. Ishman reported that Child's grandmother resided with Child and Mother until passing away earlier in 2019 of cancer, and "things got a little bad in the house" with respect to the grandmother's illness and behavior toward the end of her life. Id. at 94-95.

Trinka's son was a good friend of Child, and Trinka became friends with Mother and spent a lot of time with the family. Trinka testified that Child never disclosed any instances of abuse, and she never noticed any signs of physical abuse. Id. at 101. Her son had spent time with Child once or twice a month in 2019, and prior to that, they saw each other several times a week. She also noted that her grandmother's illness had been difficult for Child.

Finally, Child was called to testify by her GAL. She confirmed that she was afraid to go back home and would prefer to stay in her kinship placement with her aunt and uncle. She stated that Mother has hit her in response to "stupid" arguments or sometimes when Child was being "disrespectful." Id. at 110-11. Child described one incident when she ran out of the house after arguing with Mother and began walking to Ishman's home. Mother followed her in her car and yelled at her to get in. Child and Mother continued to argue while in the car, and Mother smacked Child on the face. Id. at 112-13. She testified that Mother smacks her approximately once every two months, but grabs her arms and yells at her much more frequently. Id. at 114-15. She stated that Mother's moods are unpredictable, but the yelling and arguing occurred once or twice a week. On one occasion, Mother threatened to kill or "get rid of" Child's pet birds during an argument. Id. at 116. Mother also threatened to sell the birds on two other occasions.

Child testified that Mother never told Child to kill herself, but she was aware that Child engaged in self-harm. She further testified that Mother has

said she wishes she was dead because of Child's behavior. Id. at 118. Child testified that approximately a year-and-a-half prior to the hearing, Mother grabbed her by the arm and scratched her elbow with her fingernail, leaving a scar. Id. at 129-30. Child has hidden from Mother under her bed when she did not want to continue to argue. Child told her aunt in North Carolina about some of Mother's behavior in the past, and this made Mother angry and their relationship worsened. Id. at 134-35. She also confirmed that she recalled the allegations that she made in her forensic interview and stated that she had been honest during the interview. Id. at 150. She stated that she remains afraid to return home to Mother and that she feels that she is "walking on eggshells" around her. Id. at 149, 154.

On cross-examination, Mother introduced copies of text messages that she exchanged with Child while Child was staying with her aunts in North Carolina that summer. In the messages, Mother and Child repeatedly stated that they missed one another and loved one another. Mother asked Child if she would like to live with her aunts, and Child said no. Id. at 142. Child also admitted to recording a video after an argument with Mother in which she said she hoped Mother would kill herself, among other insults. Id. at 146.

At the conclusion of the hearing, the trial court adjudicated Child dependent, finding that Mother had subjected her to physical and mental abuse. Id. at 167-69. The trial court concluded that Child's testimony was credible and supported the adjudication of dependency. Id. It subsequently

issued a written order finding that Child was without proper parental care and control under the Juvenile Act and a victim of abuse under the CPSL. Mother filed a timely notice of appeal, and the trial court and Mother have complied with Pa.R.A.P. 1925. Mother raises three issues on appeal, which we have reordered for ease of disposition.

## II.

Mother alleges that the trial court erred and her substantive due process right to the care, custody and control of Child was violated when the trial court scheduled the dependency hearing for 30 days after Child was placed in shelter care. She argues that the Juvenile Act requires, with limited exceptions, that when a child is placed in emergency protective custody, the subsequent dependency hearing must take place within 10 days.[10]

Pursuant to the Juvenile Act, a trial court may place a child in protective custody if it determines that "to allow the child to remain in the home is contrary to the welfare of the child." 42 Pa.C.S. § 6324(1). A hearing must be held within 72 hours of the child's placement to allow the court to make

_____

[10] This court reviews a trial court's grant of a continuance for an abuse of discretion. In the Interest of D.F., 162 A.3d 960, 964-65 (Pa. Super. 2017). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias, or ill-will." Id. (citation omitted). To the extent that Mother's claim involves statutory interpretation of the provision of the Juvenile Act related to shelter care hearings, we review that aspect of the claim de novo. Gavin v. Loeffelbein, 205 A.3d 1209, 1221 (Pa. 2019).

such a finding. 42 Pa.C.S. § 6332(a). If a child is placed in protective custody pending a dependency adjudication, the trial court must schedule the dependency hearing within 10 days of the filing of the petition. 42 Pa.C.S. § 6335(a); Pa.R.J.C.P. 1404(A). If the hearing is not held within 10 days, with limited exceptions, the trial court must release the child from shelter care. Id. "The purpose of the ten day hearing requirement was to prevent the continued detention of a child without a hearing to determine whether the allegations in the petition were true." In the Interest of S.N.W., 524 A.2d 514, 515 (Pa. Super. 1987).

One statutory exception to the 10 day rule is as follows:

(f) Limitations on release.--The child shall not be released from detention or shelter care under authority of subsection (a) if the failure to hold a hearing within ten days after the filing of the petition is the result of delay caused by the child. Delay caused by the child shall include, but not be limited to:

(1) Delay caused by the unavailability of the child or his attorney.

(2) Delay caused by any continuance granted at the request of the child or his attorney.

(3) Delay caused by the unavailability of a witness resulting from conduct by or on behalf of the child.

At the conclusion of any court proceeding in which the scheduled hearing is not held, the court shall state on the record whether the failure to hold the hearing resulted from delay caused by the child. Where the court determines that failure to hold a hearing is the result of delay caused by the child, the child may continue to be held in detention or shelter care. However, the additional period of detention shall not exceed ten days, provided that such detention may be continued by the court for successive ten-day intervals.

42 Pa.C.S. § 6335(f) (emphasis added).  As can be seen, the plain language of the statute allows for a continuance of the dependency hearing "at the request of the child," and the Legislature did not impose any specific basis or criteria that must be met to justify the child's request.  Id.; Gavin, supra ("[W]e are to give effect to the plain language of a provision whenever that language is clear and free from ambiguity.").  Further, while the trial court is not permitted to grant a continuance for longer than 10 days, it is permitted to grant successive 10-day continuances on the child's request.  Id.

The record of the shelter care hearing confirms that Child requested not to have any contact with Mother and to "waive" the requirement that the dependency hearing take place within 10 days.  Notes of Testimony, 7/29/19, at 7-8.  While Mother argues that the decision to delay the hearing was based on an impermissible unilateral "waiver" and not a "continuance" pursuant to the statute, this distinction is immaterial.  The delay in scheduling the hearing was based on Child's request as communicated through her GAL.  Because the statute does not require that such delay be the result of any specific factual finding other than the child's request, the request here conformed to the requirement of 42 Pa.C.S. § 6335(f)(2).

However, the statute is equally clear that when a continuance is granted pursuant to a child's request, the trial court may not delay proceedings longer than an additional 10 day period.  42 Pa.C.S. § 6335(f).  Nevertheless, "such detention may be continued by the court for successive ten-day intervals."

Id.  Based on this language, the trial court should have scheduled the hearing for, at maximum, 20 days from the date of the shelter care hearing.  If an additional continuance was then requested at that time, the trial court could have granted a successive 10-day continuance.

Even though the trial court erred in its application of 42 Pa.C.S. § 6335(f), we discern no basis for reversal.  Mother seeks to have the adjudication of dependency vacated based on this delay in holding the hearing.  Based on the plain language of the statute, there is no doubt that the trial court would have been entitled to grant successive continuances of the hearing based on Child's request through her GAL.  The dependency hearing was held 30 days after the shelter hearing, and Mother had the opportunity to present evidence, cross-examine witnesses, and contest the accuracy of the allegations in both dependency petitions.  We need not determine here the length of delay that would constitute a violation of Mother's substantive due process rights, as the 30-day delay in this case did not rise to the level of a violation.  Compare In the Interest of J.P., 832 A.2d 492, 496 (Pa. Super. 2003) (holding that the trial court erred by postponing father's dependency hearing indefinitely while his criminal charges were pending).  Even though the trial court did not follow the precise procedural requisites for continuing the dependency hearing, after the hearing, the trial court made the

appropriate findings to support the adjudication of dependency and Child's continued placement.  Accordingly, no relief is due.[11]

### III.

Mother next argues that CYS violated her substantive due process right to the care, custody and control of Child by initiating dependency proceedings on an invalid factual basis, depriving her of her right to maintain her relationship with Child and amending the dependency petition without first seeking leave from the trial court.  She further argues that the trial court contributed to the violation of her rights by delaying the adjudication hearing for 30 days.[12]  The only remedy Mother requests for these alleged violations is vacatur of the dependency order and return of Child to her custody.[13]

_____

[11] Moreover, the remedy for failure to hold the dependency hearing in a timely manner is "the automatic activation of the right of the child and its parents to the immediate release of the child from the state's custody."  In re Kerr, 481 A.2d 1225, 1226 (Pa. Super. 1984).  As outlined in Kerr, a party who objects to delay beyond the 10 day period can petition the trial court for the child's immediate release from detention, and further petition this court for such relief if necessary.  Id. at 1227-28.  Even if the continuance had not been proper under 42 Pa.C.S. § 6335(f), Mother would not be entitled to full vacatur of the adjudication of dependency as a remedy for the error.  We also note that prior to the dependency hearing, Mother filed an Emergency Application for Writ of Habeas Corpus in our Supreme Court seeking the immediate release of Child from shelter care, which was denied on September 3, 2019.

[12] As we have already addressed this contention in Part II, supra, we do not give it further consideration here.

[13] "A question regarding whether a due process violation occurred is a question of law for which the standard of review is de novo and the scope of review is

"[T]he right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause." In re D.C.D., 105 A.3d 662, 676 (Pa. 2014); see also Troxel v. Granville, 530 U.S. 57, 72-73 (2000) (plurality) ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."). However,

> in a dependency case, the liberty interest of [a parent] is not at stake and the risk of erroneous adjudication is so substantially mitigated by safeguards, reviews, and procedures directed toward uniting the family, that due process requires a less didactic approach than in criminal procedures. . . . [W]hile a dependency proceeding is adversarial in the sense that it places the state in opposition to the parent with respect to the custody of the child . . . it does not implicate the liberty interests of the parent or the child as would be the case of a defendant in a criminal action.

In re M.B., 869 A.2d 542, 546-47 (Pa. Super. 2005) (quoting In re J.P., 573 A.2d 1057, 1061-62 (Pa. Super. 1990) (en banc) (plurality)).

Not all due process protections attendant to adult criminal proceedings are applicable in the dependency context because dependency proceedings "are not purely adversarial and [] traditional concepts of Parens Patriae, and the focus on the unity of the family and the best interest of the child, are sufficiently important to avoid hindering the court with procedural and

_____

plenary." Interest of S.L., 202 A.3d 723, 729 (Pa. Super. 2019) (citation omitted).

technical limitations." In re J.P., 573 A.2d 1057, 1062 (Pa. Super. 1990) (en banc) (plurality). Even though a fit parent has a substantive due process right to the care, custody and control of her children, "[b]roadly speaking, the state, acting pursuant to its parens patriae power, has a compelling interest in safeguarding children from various kinds of physical and emotional harm and promoting their wellbeing." D.P. v. G.J.P., 146 A.3d 204, 211 (Pa. 2016).

Mother initially challenges CYS's erroneous reliance on her paramour's status as a registered sex offender to initiate dependency proceedings and remove Child from the home.[14] CYS filed its application for emergency protective custody and the first dependency petition on the basis that Mother's paramour was required to register as a sex offender and was left unsupervised with Child in the home. CYS noted in the petition that Mother had provided it with a court order from Clearfield County stating that Mother's paramour was to be removed from the registry. However, CYS knew that he had an additional registerable conviction in Jefferson County. CYS further averred that it had spoken with the "Megan's Law Registry in Harrisburg" prior to

_____

[14] Curiously, the first dependency petition does not specifically reference the definition of abuse under the CPSL, but rather alleges only that Child was without proper parental care and control under the Juvenile Act. See Dependency Petition, 7/31/19. However, it is evident from the language of the petition and Gow's testimony at the dependency hearing that CYS was making an allegation of "child abuse" under the CPSL as a basis for dependency in the first petition. See 23 Pa.C.S. § 6303(b.1)(8)(vii)(A). All parties proceeded on this basis at the shelter care and dependency hearings.

petitioning for emergency protective custody, and learned that he was still on the registry, but his status was under review. See Dependency Petition, 7/31/19, at 3. At the dependency hearing, Gow testified that she did not receive confirmation that Mother's paramour had been removed from the registry until August 16, 2019. Notes of Testimony, 8/28/19, at 16-17.

Under the CPSL, "child abuse" includes intentionally, knowingly or recklessly "[l]eaving a child unsupervised with an individual, other than the child's parent, who the actor knows or reasonably should have known: is required to register as a Tier II or Tier III sexual offender." 23 Pa.C.S. § 6303(b.1)(8)(vii)(A). CYS may take a child into protective custody under the CPSL "for protection from abuse," 23 Pa.C.S. § 6315(a)(4), or pursuant to the Juvenile Act, when a court determines "that to allow the child to remain in the home is contrary to the welfare of the child," 42 Pa.C.S. § 6324(1).

Based on these provisions, CYS sought emergency protective custody of Child and filed the first dependency petition. While Mother provided CYS with a court order dictating that her paramour was to be removed from the registry, CYS's further investigation determined that he remained an active registrant at the time it filed for protective custody of Child. While Mother's paramour arguably should have been removed from the registry prior to CYS's involvement with the family, CYS exercised due diligence to determine his current status before removing Child from the home. When CYS learned that Mother's paramour had officially been removed from the registry, it no longer

sought dependency on that basis. Based on these facts, we find that there was no due process violation when CYS acted in accordance with the statute by seeking emergency protective custody of Child and filing the first dependency petition based on its investigation and knowledge of the circumstances at the time.

Mother also argues that her substantive due process rights were violated when CYS filed its second dependency petition, which the trial court later treated as an amendment to the first, without seeking leave pursuant to Pa.R.J.C.P. 1334(A)(2). Mother does not deny that the trial court has the authority to allow CYS to amend a dependency petition, as long as such amendment does not result in prejudice to a party. She also does not argue that she was prejudiced in her ability to defend against the allegations in the second petition at the hearing. Rather, she argues that her relationship with Child suffered prejudice through Child's placement in emergency protective custody while CYS conducted further investigation into the ChildLine reports.

Under Pa.R.J.C.P. 1334(A)(2), "[a]bsent prejudice to any party, the court may allow a petition to be amended if the petition alleges a different set of events or allegations, where the elements or matters of proof by any party are materially different from the elements or matters of proof to the allegation originally petitioned." If such an amendment is permitted, the court may grant a continuance or other appropriate relief to allow any party to prepare for the hearing. Pa.R.J.C.P. 1334(B).

Here, CYS filed the first dependency petition on July 31, 2019, based on Mother leaving Child unattended with a registered sex offender. On August 8, 2019, CYS received the second ChildLine report related to Mother's treatment of Child, and Child confirmed the allegations in a forensic interview a few days later. CYS also received confirmation from the district attorney on August 16, 2019, that Mother's paramour had been removed from the registry. Accordingly, on August 19, 2019, CYS filed the second dependency petition based on the allegations from the second ChildLine report and stated that it would no longer seek dependency on the basis alleged in the first petition.

Notably, immediately before the adjudicatory hearing began on August 28, 2019, Mother's counsel conceded that the trial court had the power to treat the second petition as an amendment of the first. Notes of Testimony, 8/28/19, at 5 ("[T]hey have undercut the allegations in the first [petition], and the second doesn't have approval of court to proceed on unless Your Honor says, hey, I'll treat this as an amendment, which you can do. . . You clearly got discretion."). The trial court granted CYS's oral motion to treat the second dependency petition as an amendment. Id. Mother did not request a continuance or any other form of relief because of the amendment, and she does not now argue that she was unable to prepare a defense to the allegations in the second petition because of the late-granted amendment.

Under these circumstances, we discern no violation of Mother's due process rights. As explained supra, CYS abided by the terms of the Juvenile Act and the CPSL when it sought emergency protective custody of Child, and as conceded by Mother, the trial court was within its discretion to allow CYS to amend the dependency petition based on the allegations that were reported after the shelter care hearing. While it is true that Mother was deprived of custody of Child after the shelter care hearing, neither emergency protective custody nor an adjudication of dependency is a per se violation of Mother's due process rights. Mother was provided with notice and the opportunity to defend herself against the allegations in all proceedings in the trial court, and the provisions of the Juvenile Act and CPSL related to those proceedings provide sufficient process to protect Mother's rights. No relief is due.

IV.

Finally, Mother argues that the trial court's determination that Child is dependent was not supported by clear and convincing evidence.[15] The trial court issued an order adjudicating Child dependent on two independently

_____

[15] In dependency proceedings, we review the juvenile court's order for an abuse of discretion. In the Interest of H.K., 172 A.3d 71, 74 (Pa. Super. 2017). As such, we must accept the court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. Id. "[W]e accord great weight to the [juvenile] court's fact-finding function because the [juvenile] court is in the best position to observe and rule on the credibility of the parties and witnesses." In re T.M.A., 207 A.3d 375, 380 (Pa. Super. 2019) (citation omitted; alterations in original).

sufficient bases. See Order of Adjudication, 8/28/18, at 1-2. First, it found that Child was without proper parental care or control as defined under the Juvenile Act. See 42 Pa.C.S. § 6302(1). Second, it found that Mother had subjected Child to mental and physical abuse as defined in the CPSL. See 23 Pa.C.S. § 6303. We affirm the adjudication of dependency on the first basis.

The Juvenile Act permits a court to adjudicate a child dependent if it finds that he or she meets the requirements of one of ten listed definitions. The Act defines "dependent child" as follows, in relevant part:

"Dependent child." A child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1). "Proper parental care" is care "which (1) is geared to the particularized needs of the child and (2) at minimum, is likely to prevent serious injury to the child." In re A.B., 63 A.3d 345, 349 (Pa. Super. 2013) (citation omitted). Proof that a parent has committed abuse is not necessary for a child to be found dependent under the Juvenile Act. In re R.R., 686 A.2d 1316, 1317 (Pa. Super. 1996). Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." In re G.T., 845 A.2d 870, 872 (Pa. Super. 2004).

Following reception of the evidence, the trial court found that Child's testimony was credible in all respects, and we are bound by this determination on appeal. Notes of Testimony, 8/28/19, at 167-68. Child's testimony provided clear and convincing evidence that Mother's actions had placed her physical, mental and emotional health at risk. Child testified that Mother slapped her every other month and grabbed her every other week, once gripping her arm so hard that she left a scar on Child's elbow. Id. at 112-15, 129-30. Even when she would not physically grab or slap Child, Mother yelled at and argued with Child multiple times a week. Id. Child further testified that Mother's moods were very volatile and that she had to "walk on eggshells" because she did not know what would anger Mother. Id. at 121, 132-33. Mother threatened to "get rid of" or kill Child's pet birds when she was angry with Child. Id. at 116-19. Child told her aunt about some of these interactions with Mother, but when her aunt spoke to Mother about Child's disclosure, Mother became angry with Child and she felt unsafe. Id. at 134, 149.

Additionally, Mother knew that Child engaged in self-harm, but responded only by telling Child that she could not successfully kill herself unless she cut herself down the length of her vein rather than across her arm. Id. at 117. Mother told Child on multiple occasions that she wished she was dead so that she would not have to be around Child. Id. at 118. The totality of Mother's actions left Child afraid to go home, and she testified that she would not feel safe returning home because Mother would "hold a grudge."

Id. at 110, 149. Child told Dr. Ryen that she "did not want to see her mother, did not want to talk to her mother, and that she didn't care if she ever saw her mother again." Dr. Ryen's Report, Record at 225 (emphasis in original). Child did not want to meet with Mother at the bonding assessment and became emotional and agitated when faced with the possibility of seeing her. Id. As a result, Dr. Ryen recommended that Mother have no unsupervised contact with Child until the issues in their relationship could be addressed. Child's testimony evidenced more than a pre-teen who merely disagrees with her parent; it showed prolonged physical and mental distress.

Further, the record reveals that Mother was unwilling to cooperate with CYS when it initiated the dependency proceedings and remained combative and argumentative with CYS after the dependency petitions were filed. Id. at 31-37. After one attempt to speak with Mother about the allegations in the first ChildLine report, PSP advised CYS to never return to Mother's home without an escort. Id. at 76. CYS's experiences with Mother corroborated Child's descriptions of her personality and demonstrated that Mother was unwilling to work with experts to address the breakdown of her relationship with Child. Based on all of the above circumstances, we conclude that the adjudication of dependency was based on clear and convincing evidence that Mother's actions toward Child put her physical, mental and emotional health at risk such that she lacked proper parental care and control.

Order affirmed. Application to File Supplemental Brief is denied.

Judgment Entered.

Joseph D. Seletyn, Esc.
Prothonotary

Date:   3/13/2020